AMERICAN CHEMICAL SOCIETY, APPELLANT, *v.* LEADSCOPE, INC., ET AL., APPELLEES.

**[Cite as *Am. Chem. Soc. v. Leadscope, Inc.*,**

**133 Ohio St.3d 366, 2012-Ohio-4193.]**

*Unfair competition—An unfair-competition claim based on legal action must show both that the litigation was objectively baseless and that it was intended to injure the plaintiff's ability to be competitive, but the verdict for Leadscope on this claim stands—Defamation—As a matter of law, American Chemical Society did not defame Leadscope and its employees—Judgment upholding defamation verdict reversed.*

(No. 2010-1335—Submitted September 7, 2011—Decided September 18, 2012.)

APPEAL from the Court of Appeals for Franklin County, No. 08AP-1026, 2010-Ohio-2725.

_____

**SYLLABUS OF THE COURT**

1.  To successfully establish an unfair competition claim based upon legal action, a party must show that the legal action is objectively baseless and that the opposing party had the subjective intent to injure the party's ability to be competitive.

2.  In determining whether a statement is defamatory as a matter of law, a court must review the totality of the circumstances and read the statement in the context of the entire publication to determine whether a reasonable reader would interpret it as defamatory.

3.  A client is vicariously liable for its attorney's defamatory statements only if the client authorized or ratified the statements.

_____

**O'CONNOR, C.J.**

## RELEVANT BACKGROUND

### Facts

{¶ 1} Appellant, American Chemical Society ("ACS"), is a nonprofit corporation chartered by Congress that promotes the advancement of professional chemists and the chemical sciences through publications, meetings, education, and other activities throughout the world. 36 U.S.C. 20502.

{¶ 2} ACS's largest division, Chemical Abstracts Service ("Chemical Abstracts" or "CAS"), is in Columbus, Ohio. Chemical Abstracts produces comprehensive databases of chemical information that include more than 20 million abstracts of chemistry-related literature and patents. The databases of chemical compounds and chemical reactions are accessed by scientists and researchers. Robert Massie is president of Chemical Abstracts; he reports to the executive director of ACS.

{¶ 3} Appellees Paul E. Blower Jr., Ph.D., Glenn J. Myatt, Ph.D., and Wayne P. Johnson were employed by Chemical Abstracts. During their employment, Blower and Myatt worked to develop a software tool named CAPathFinder ("PathFinder") that was intended to improve the ability of researchers to access and organize the voluminous information available in ACS's databases.

{¶ 4} Chemical Abstracts suspended the PathFinder project in 1997 to the disappointment of Blower and Myatt, who believed the software product had potential. Blower, Myatt, and Johnson soon resigned from Chemical Abstracts to start their own business, Leadscope, Inc., to develop a software product to aid in exploring and displaying chemical compounds. Massie personally expressed concern to his colleagues that Blower, Myatt, and Johnson may have appropriated a software code or other intellectual property developed while working on comparable projects at ACS.

**{¶ 5}** ACS learned in January 2001 that Leadscope had applied for a patent. When ACS discovered appellees' patent-application materials, ACS formed a working group to analyze them, referred the matter to the legal department, and retained outside counsel. Leadscope received a United States patent for its software in November 2001.

**{¶ 6}** In early 2002, the ACS Governing Board for Publishing and the ACS board of directors approved legal action against Leadscope if ACS and Leadscope could not reach an amicable resolution. On April 11, 2002, Michael Dennis, CAS's legal-administration manager, called Leadscope's chief financial officer, Michael Conley, to set up a meeting on April 15. At the meeting, Dennis presented Conley with a draft complaint alleging misappropriation of ACS's intellectual property and a letter stating that the complaint would be filed if the parties could not resolve the matter immediately. At this point, Leadscope was operating on venture capital and was attempting to secure new funding to meet payroll by the end of the month.

**{¶ 7}** The parties then engaged in discussions over the next two weeks, with ACS demanding $1 million and ownership of the Leadscope patent. After the parties failed to reach a resolution, ACS filed a federal lawsuit against Leadscope, Blower, Myatt, and Johnson (collectively, "Leadscope") on May 1, 2002. On the same date, Dennis and another manager circulated an internal memorandum to "All Staff" at ACS about the lawsuit. The memorandum stated:

> Re: Communication re: Legal Matter
>
> The nonprofit American Chemical Society has filed a legal complaint against Leadscope, Inc., and its founders, who sought and received a patent for technology indistinguishable from a project on which they worked while employees of the Society's Chemical Abstracts Service in the mid-1990s.

The Society is a leader in publishing scientific journals and databases that are indispensable to chemists around the globe, and is acting to protect its intellectual property and proprietary information.

Staff members are not authorized to comment on this matter. It is important that you refrain from communicating and/or commenting about this subject to any individual while the legal process is being pursued.

{¶ 8} Ten days later, a statement was published in Columbus's Business First newspaper. The article quoted ACS's outside counsel as follows: "Our motivation in filing suit is to acquire back the protected information that they took from us." The article described both the allegations in the complaint and Leadscope's response, including a statement from Myatt that the lawsuit "has no merit" and a quote from Leadscope's counsel that "[t]he timing of this lawsuit [days before Leadscope was to close a venture-capital deal] speaks volumes as to its invalidity."

**Procedural History**

{¶ 9} ACS filed a complaint in the United States District Court for the Southern District of Ohio on May 1, 2002. Leadscope moved to dismiss the federal complaint for lack of diversity jurisdiction. ACS then voluntarily dismissed its lawsuit and refiled it in the Franklin County Court of Common Pleas in July 2002.

{¶ 10} The complaint alleged claims for breach of employment agreements, misappropriation of trade secrets, unfair competition, breach of fiduciary duty and the duty of loyalty, and conversion, and for violation of ACS's implied license under shop right. Leadscope responded by denying all claims and filing counterclaims alleging defamation, tortious interference with business

4

relations, unfair competition, violation of the Ohio Deceptive Practices Act, intimidation and extortion, and violation of the Ohio Pattern of Corrupt Activities statute.

{¶ 11} Jury trial began on February 4, 2008, and lasted eight weeks. After the evidence had been presented to the jury, both sides moved for a directed verdict. ACS specifically moved for a directed verdict on Leadscope's unfair competition claim, arguing that Leadscope "must prove by a preponderance of the evidence that the ACS litigation was not founded upon good faith." ACS then defined "good faith" to mean that "ACS has no evidentiary support for its claims, one; two, [ACS] know[s it has] no evidentiary support for [its] claims." The trial court denied ACS's motion as well as Leadscope's motion for a directed verdict.

{¶ 12} The parties then met with the judge regarding jury instructions. During these conferences, ACS objected to submitting to the jury certain instructions on many of Leadscope's counterclaims, including the unfair competition instruction. ACS asserted that it had an absolute privilege to make its accusations against Leadscope unless those claims were objectively baseless, and that the accusations could not have been objectively baseless because the trial court had allowed the jury to decide their validity. ACS also addressed the legal viability of Leadscope's defamation counterclaim, asserting that ACS had a qualified privilege to make its statements to its employees and the media because the comments were related to litigation. The trial court made some changes based on those objections.

{¶ 13} ACS also filed written objections to the jury instructions and submitted the following proposed jury instructions on Leadscope's unfair competition allegation:

> Unfair competition. Count Three of defendants' counterclaim seeks damages from ACS for unfair competition by

5

way of malicious litigation. You cannot find that ACS engaged in unfair competition by malicious litigation unless LeadScope proves each of the following basic requirements of that tort by a preponderance of the evidence:

(1) That LeadScope was a competitor of ACS and that LeadScope and ACS were producing and selling the same commodities; and

(2) That ACS filed its lawsuit in bad faith and without probable cause, meaning that ACS's lawsuit had no basis and ACS knew that the lawsuit had no basis; and

(3) That ACS filed its lawsuit maliciously for the purpose of harassing and injuring LeadScope; and

(4) That LeadScope was injured as a proximate result of ACS's lawsuit.

{¶ 14} The trial court overruled ACS's objections and instructed the jury in accordance with the March 21, 2008 jury instructions as follows:

Malicious Litigation

In Ohio, unfair competition may consist of malicious acts by way of litigation in court that is not founded in good faith, but is for the purpose of harassing and injuring a rival producing and selling the same commodities. It is the law that the pursuit of one competitor by another, either in court or out of court, for the purpose of injuring his business, is prohibited.

If you find by the greater weight of the evidence that Plaintiff has committed malicious acts by way of litigation in the courts, or if you find litigation was not founded upon good faith, but was

instituted with the intent and purpose of harassing and injuring a rival engaged in the same business you should find for the Defendants on their counterclaim of unfair competition in an amount that would fairly compensate Defendants for the damage suffered by reason thereof.

{¶ 15} The jury returned verdicts against ACS on its claims for breach of contract and misappropriation of trade secrets. ACS prevailed on two of Leadscope's counterclaims, but the jury returned verdicts in favor of Leadscope on its counterclaims for defamation, tortious interference, and unfair competition. Leadscope was awarded a total of $26.5 million in compensatory and punitive damages, plus attorney fees. The trial court overruled ACS's postverdict motions for judgment notwithstanding the verdict, new trial, and remittitur.

{¶ 16} ACS appealed to the Tenth District Court of Appeals, setting forth six assignments of error. Leadscope filed a conditional cross-appeal. The court of appeals affirmed the judgment of the trial court "in all respects" and therefore held that Leadscope's assignment of error was moot. *Am. Chem. Soc. v. Leadscope*, 10th Dist. No. 08AP-1026, 2010-Ohio-2725, ¶ 101-102. Specifically, the Tenth District held that "the trial court did not err in denying ACS's motion for judgment notwithstanding the verdict on the unfair competition claim." *Id.* at ¶ 45. The appellate court held that in Ohio, "malicious litigation [is] a basis for an unfair competition claim" and that the bad faith standard, not an "objectively baseless" standard, "is better suited to the nature of" such a claim. *Id.* at ¶ 29, 31.

{¶ 17} The Tenth District also held that "[t]he trial court did not err in overruling ACS's motion for judgment notwithstanding the verdict on Leadscope's counterclaim for defamation or in refusing to reduce the amount of damages pursuant to ACS's motion for remittitur." *Id.* at ¶ 64. The appellate court held that the trial court correctly concluded that ACS's statements were not

absolutely privileged and that the statements "exceed[ed] a mere statement that the parties disputed ownership of the intellectual property incorporated in Leadscope's products." *Id*. at ¶ 56-57. The appellate court also held that there was "sufficient evidence upon which the jury could find by clear and convincing evidence that ACS had published the statements in the memorandum and the Business First article with actual malice"—that is, " 'with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity.' " *Id*. at ¶ 59-61, quoting *Jacobs v. Frank*, 60 Ohio St.3d 111, 116, 573 N.E.2d 609 (1991). The Tenth District also held as an initial matter that "ACS never objected to the trial court's instruction on general damages and waived any objections to the jury's considering of this issue."[1] *Id*. at ¶ 64. Further, the appellate court held that "the damages the jury awarded for both special and general damages were properly supported in the noted evidence." *Id*.

{¶ 18} We accepted the cause as a discretionary appeal. *Am. Chem. Soc. v. Leadscope, Inc.*, 126 Ohio St.3d 1615, 2010-Ohio-5101, 935 N.E.2d 854. There are four propositions of law before us:

> (1) A party has a constitutional right to petition the courts for a redress of grievances and cannot be found liable for "malicious litigation" or "wrongful" interference unless a lawsuit is objectively baseless.
>
> (2) As a matter of Ohio common law, a claim of malicious litigation requires *both* the lack of an objective basis *and* subjective "bad faith" or malice.

---

1. This determination is contrary to the evidence of ACS's objections to proposed jury instructions, which specifically state, "You may award general damages for these statements * * *." ACS's objections and proposed instructions were filed with the trial court prior to the issuance of the jury instructions.

(3) A party may not be found liable for defamation, or to have acted with actual malice, where it makes limited statements that accurately describe a public lawsuit and that have an objective basis in fact.

(4) Damages for defamation must be based upon harm caused by the defamatory statements, as distinct from harm caused by a public lawsuit or other proceeding.

(Emphasis sic.)

{¶ 19} For the reasons that follow, we uphold the appellate court's decision finding that the trial court did not err in denying ACS's motion for judgment notwithstanding the verdict on the unfair competition claim. But we hold that when a party alleges a claim for unfair competition, the party must show that the legal action is objectively baseless and that the opposing party had the subjective intent to injure the party's ability to be competitive.

{¶ 20} The jury instructions here did not meet that test, but instead focused solely on whether ACS brought the lawsuit in good faith—that is to say, the instructions focused on ACS's action to harass and injure Leadscope and not on the objective legitimacy of ACS's claims. However, upon a thorough review of the evidence presented by Leadscope and the evidence presented by ACS, we find that even if the jury had been instructed on the proper standard of law, the jury could not reasonably have made any other determination. We therefore affirm the judgment of the court of appeals regarding Leadscope's unfair competition claim.

{¶ 21} We reverse the appellate court's decision finding that the trial court did not err in overruling ACS's motion for judgment notwithstanding the verdict on Leadscope's counterclaim for defamation. We hold that when reviewed under the totality of the circumstances and in the context of the entire publications,

ACS's statements in the internal memorandum and its attorney's statements in Business First are not defamatory as a matter of law. We further hold that a client is vicariously liable for its attorney's defamatory statements only if the client authorized or ratified the statements.

## ANALYSIS

### I. LEADSCOPE'S UNFAIR COMPETITION CLAIM

#### A. *The "objectively baseless" element is a necessary element to prove an unfair competition claim by way of malicious litigation*

{¶ 22} One of the most fundamental and protected rights of our judicial system is the ability of citizens to access the courts. This right is preserved in both the First Amendment to the United States Constitution and Article I, Section 16 to the Ohio Constitution. The First Amendment provides that "Congress shall make no law * * * abridging * * * the right of the people * * * to petition the Government for a redress of grievances." Article I, Section 16 of the Ohio Constitution reads: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

{¶ 23} Although the courthouse doors are open to all litigants, both the United States Supreme Court and this court have set limitations on the right to redress claims that are brought as a sham, to vex and annoy, or in an attempt to interfere directly with a competitor's business relationships. In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), the Supreme Court recognized this limitation and held that the First Amendment right to access the courthouse does not extend to sham litigation. We too have recognized the limitation to the right to seek redress by holding: "Despite the paramount importance placed on the ability to access the courts for redress of injuries, the right is not absolute." *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, ¶ 11.

**{¶ 24}** Notwithstanding the limitations on claims brought as a sham, there was no clarity regarding what constituted "sham litigation" until *Professional Real Estate Investors*. In that case, Columbia Pictures sued Professional Real Estate Investors, Inc., "a resort hotel[,] * * * for alleged copyright infringement through the rental of videodiscs for viewing in hotel rooms." *Professional Real Estate Investors* at 51-52. Professional Real Estate Investors "counterclaimed, charging Columbia [Pictures] with violations of * * * the Sherman Act * * * and various state-law infractions." *Id*. at 52. Specifically, Professional Real Estate Investors "alleged that Columbia's copyright action was a mere sham that cloaked underlying acts of monopolization and conspiracy to restrain trade." *Id*.

**{¶ 25}** For the first time, the Supreme Court delineated a two-part definition of "sham litigation":

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under [*E. RR. Presidents Conference v*.] *Noerr* [*Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) ("*Noerr-Pennington* Doctrine")] and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor," *Noerr, supra*, 365 U.S. at 144[, 81 S.Ct. at 533, 5 L.Ed.2d 464] (emphasis added), through the "use [of] the governmental *process*—as opposed to the *outcome* of that

process—as an anticompetitive weapon," [*Columbia v.*] *Omni* [*Outdoor Advertising, Inc*.], 499 U.S. [365], 380, 111 S.Ct. [1344, 113 L.Ed.2d 382 (1991)] (emphasis in original)."

(Footnote omitted.) *Id*. at 60-61.

**{¶ 26}** In crafting its definition, the Supreme Court specifically rejected "a purely subjective definition of 'sham.' " *Professional Real Estate Investors*, 508 U.S. at 60, 113 S.Ct. 1920, 123 L.Ed.2d 611. "Our decisions therefore establish that the legality of objectively reasonable petitioning 'directed toward obtaining governmental action' is 'not at all affected by any anticompetitive purpose [the actor] may have had.' " *Id*. at 59. Indeed, the court held that it has "repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." *Id*., citing *Fed. Trade Comm. v. Superior Court Trial Lawyers Assn.*, 493 U.S. 411, 424, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990); *Natl. Assn. for the Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886, 913-914, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). The court also held that "even an 'improperly motivated' lawsuit may not be enjoined under the National Labor Relations Act as an unfair labor practice unless such litigation is 'baseless.' " *Id*., quoting *Bill Johnson's Restaurants, Inc. v. Natl. Labor Relations Bd.*, 461 U.S. 731, 743-744, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983).

**{¶ 27}** It is clear that sham litigation "contains an indispensable objective component" and, therefore, does not "turn[] on subjective intent alone." *Id*. at 58, 59; see also *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), fn. 4 (private unethical action that is not genuinely aimed at procuring favorable government action is a sham as opposed to a valid effort to influence government action); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 380, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (describing a

sham as "evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims"). Thus, when courts are analyzing a claim for sham litigation, they must not focus solely on a party's subjective intent, but must also determine whether the party's lawsuit is objectively baseless.

**{¶ 28}** In *Greer-Burger*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, we followed and quoted the United States Supreme Court's definition of "sham litigation" as set forth in *Professional Real Estate Investors*. *Id*. at ¶ 11. In *Greer-Burger*, an employee had filed a sexual-harassment suit against her employer. *Id*. at ¶ 2. After a trial, the jury found in favor of the employer. *Id*. In turn, the employer filed suit against the employee and alleged, among other things, malicious prosecution. *Id*. The employer argued that he had incurred significant attorney fees and costs by defending against the employee's lawsuit. *Id*.

**{¶ 29}** In response to the employer's lawsuit, the employee "filed a sworn-charge affidavit with the Ohio Civil Rights Commission ("OCRC")" and argued that the employer's "lawsuit was a prohibited retaliatory violation." *Id*. at ¶ 3. OCRC issued an order prohibiting the employer from proceeding with his lawsuit. *Id*. at ¶ 6. The employer appealed to the trial court, which affirmed the OCRC's order. *Id*. at ¶ 7. The Eighth District affirmed as well. *Id*. at ¶ 8.

**{¶ 30}** We reversed and held, "[E]ven assuming arguendo that [the employee] has established a prima facie case of retaliation, [the employer] must be afforded an opportunity to show that there is an *objective basis* for his lawsuit." (Emphasis added.) *Id*. at ¶ 15. We further held:

> [A]n employer [should have] the opportunity to demonstrate that the suit is not objectively baseless. In determining whether the employer's action has an objective basis, the OCRC administrative-law judge should review the employer's lawsuit

pursuant to the standard for rendering summary judgment. Thus, an employer needs to "show[] his lawsuit raises genuine issues of material fact." [*Bill Johnson's*, 461 U.S.] at 746, 103 S.Ct. 2161, 76 L.Ed.2d 277. If the employer satisfies this standard, the suit does not fall under the definition of sham litigation. The suit, therefore, shall proceed in court while the proceedings before the OCRC shall be stayed.

*Id.* at ¶ 16.

**{¶ 31}** Based upon our own precedent and that of the Supreme Court, courts should not focus solely on a party's subjective intent, i.e., good or bad faith, when analyzing an unfair competition claim by way of malicious litigation, as the court of appeals in this case held.[2]

**{¶ 32}** In this case, the Tenth District Court of Appeals cited *Henry Gehring Co. v. McCue*, 23 Ohio App. 281, 154 N.E. 171 (8th Dist.1926), as "the seminal Ohio case adopting malicious litigation as a basis for the tort of unfair competition." *Am. Chem. Soc.*, 2010-Ohio-2725, ¶ 30. This was true, however, until our decision in *Greer-Burger* in December 2007, a mere two months before the trial commenced in this case.

**{¶ 33}** In *Henry Gehring*, the plaintiff alleged that the defendant's conduct was "of such persistent and continuous nature as has resulted in damage to the [plaintiff] in the production and sale of its wares at common law." *Henry*

---

2. We recognize that the "sham litigation" definition set forth in *Professional Real Estate Investors* was created within the context of federal antitrust law. However, we find its rationale to be identical to the issue in the present case, i.e., maintaining access to the courthouse. Moreover, applying the *Professional Real Estate Investors* test to lawsuits outside the context of federal antitrust law is not a new concept for this court. *See Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174. In *Greer-Burger*, an employer retaliation case, we first adopted the test in *Professional Real Estate Investors*. *Id.* at ¶ 11. Therefore, the analysis in *Professional Real Estate Investors* is not limited to the confines of federal antitrust law, but is applicable to cases involving unfair competition claims based upon malicious litigation.

*Gehring* at 283. The defendant argued that the allegations stated in the petition did not constitute a cause of action in state court. *Id*. at 282.

{¶ 34} The Eighth District held:

There is well-established authority for the holding that the pursuit of one competitor by another, either in court or out of court, for the purpose of injuring him in his business, may result in recovery under sufficient proof. There are numerous cases of successful recoveries because of malicious acts by way of litigation in the courts, where it appears that the litigation was not founded upon good faith, but was instituted with the intent and purpose of harassing and injuring a rival producing and selling the same commodity.

*Id*. at 283-284.

{¶ 35} Using *Henry Gehring* as a guidepost, the Tenth District held that "the bad faith standard is better suited to the nature of the malicious litigation claim than is the 'objectively baseless' standard." *Am. Chem. Soc.*, 2010-Ohio-2725, ¶ 31. Consequently, the Tenth District held that "the trial court properly instructed the jury that litigation not founded in *good faith*, but brought for the purpose of harassing and injuring a rival who was producing and selling the same commodities, could support Leadscope's unfair competition claim." (Emphasis added.) *Id*. Thus, the appellate court held that "the trial court did not err in denying ACS's motion for judgment notwithstanding the verdict on the unfair competition claim * * *." *Id*. at ¶ 45.

{¶ 36} We disagree with the Tenth District's conclusion that the "bad faith" standard is the appropriate standard for an unfair competition claim by way of malicious litigation. In being presented with this standard, the jury was

improperly instructed to focus solely on ACS's subjective intent. This flawed instruction did not direct the jury to consider whether the lawsuit was objectively baseless, contrary to the case law on this issue under *Greer-Burger* and *Professional Real Estate Investors*.

{¶ 37} We hold that to successfully establish an unfair competition claim based upon legal action, a party must show that the legal action is objectively baseless and that the opposing party had the subjective intent to injure the party's ability to be competitive. Here, the jury instructions were inadequate because they did not include the "objectively baseless" element necessary to meet the two-part test for an unfair competition claim.

{¶ 38} Even though we hold that the trial court failed to properly instruct the jury on Leadscope's unfair competition claim, we find it necessary to address Leadscope's assertion that ACS waived its claim of *Noerr-Pennington* immunity because immunity is an affirmative defense that must be pleaded in an answer or it is waived under Civ.R. 8(C) (affirmative defenses).[3] ACS did not assert *Noerr-Pennington* immunity by name. Leadscope argues that pursuant to Civ.R. 8(C), ACS waived *Noerr-Pennington* immunity because it did not expressly raise it until ACS filed its motion for judgment notwithstanding the verdict.[4] See Civ.R.

---

3. *Noerr-Pennington* immunity is a "doctrine [that] originated in the anti-trust context as the proposition that 'joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.' " *WE, Inc. v. Philadelphia, Dept. of Licenses & Inspections*, 174 F.3d 322, 326 (3d Cir.1999), quoting *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *see also Noerr,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464. The United States Supreme Court has held, "Those who petition government for redress are generally immune from antitrust liability." *Professional Real Estate Investors,* 508 U.S. at 56, 113 S.Ct. 1920, 123 L.Ed.2d 611. This type of immunity from antitrust liability is otherwise known as *Noerr-Pennington* immunity.

4. Many courts have held that *Noerr-Pennington* immunity should be raised as an affirmative defense. *See Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 860 (5th Cir.2000); *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287 (5th Cir.2000); *North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 52 (4th Cir.1981). Even so, as the Fifth Circuit in *Bayou Fleet* explained, the general rule of waiver does not apply when the defense is raised later

8(C) ("a party shall set forth affirmatively * * * any other matter constituting an avoidance or affirmative defense").

{¶ 39} ACS counters that it did not waive *Noerr-Pennington* immunity, because it argued repeatedly for a directed verdict on the unfair competition and tortious interference claims. ACS further submits that it also argued that it was entitled to *Noerr-Pennington* immunity when ACS filed its objections to the trial court's jury instructions on March 24, 2008. ACS argues that it is not required to specifically use the words "*Noerr Pennington*" or "First Amendment" and that its objections to the jury instructions preserved its argument for *Noerr-Pennington* immunity on appeal. The second and third paragraphs of its proposed jury instruction, it claims, invoked the *Noerr-Pennington* doctrine and the correct standard of law to provide immunity on Leadscope's unfair competition claim.

{¶ 40} The parties' focus on the waiver issue is a red herring in this case. Here, ACS filed a lawsuit against Leadscope. Leadscope then counterclaimed, alleging, among other claims, unfair competition. As the counterclaimant, Leadscope had the burden of proving its claim for unfair competition, regardless of whether ACS did or did not plead *Noerr-Pennington* immunity as an affirmative defense. In *Professional Real Estate Investors*, the Supreme Court held:

> [E]ven a plaintiff who defeats the defendant's claim to *Noerr*[-*Pennington*] immunity by demonstrating both the objective and the subjective components of a sham must still prove a substantive antitrust violation. Proof of a sham merely deprives

but does not result in unfair surprise or "if it is raised at a 'pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond.' " *Id*. at 860, quoting *Chambers v. Johnson,* 197 F.3d 732, 735 (5th Cir.1999).

the defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his claim.

*Professional Real Estate Investors,* 508 U.S. at 61, 113 S.Ct. 1920, 123 L.Ed.2d 611. Therefore, the burden remained on Leadscope to prove its unfair competition claim. *Noerr-Pennington* immunity is a shield from liability, and Leadscope cannot escape its burden of proving its own claim by wielding the *Noerr-Pennington* doctrine as a sword.

{¶ 41} Furthermore, independent of the question of ACS's preservation of an affirmative defense is the question whether the trial court appropriately instructed the jury as to the standard for finding unfair competition by way of malicious litigation. That is the question we were asked to address when we accepted the cause for discretionary review, and that is the question we have answered.

**B.** *Although the jury should have been instructed on the "objectively baseless" standard, there is overwhelming evidence to support the jury's verdict against ACS*

{¶ 42} Today we hold that the "objectively baseless" standard is the correct standard for an unfair competition claim based upon malicious litigation, and therefore, the trial court should have instructed the jury to apply that standard. Here, the trial court improperly instructed the jury to apply a "bad faith" standard. In affirming the use of the "bad faith" standard, the appellate court reviewed the evidence presented to the jury and held, "The jury, as trier of fact, was entitled to draw permissible inferences from the chronology, course, and scope of litigation ACS undertook and to conclude ACS's civil action constituted malicious litigation."

{¶ 43} We, too, find it necessary to highlight certain evidence that was presented by ACS and Leadscope.

18

*1. ACS's Evidence*

{¶ 44} ACS claimed that Leadscope misappropriated PathFinder. The jury was instructed that to constitute misappropriation, the information at issue must be a trade secret. The jury was also instructed that a trade secret is information that "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Although ACS never expressly argued to the jury what trade secret Leadscope allegedly took, the PathFinder source code was the only "secret" property. Indeed, the majority of the evidence adduced by ACS was focused on PathFinder's source code.

{¶ 45} CAS's President Massie had testified at deposition that "the source code is * * * an extraordinarily important and central tangible item in the sense that it's reduced to some medium." He had also testified that he was most interested in the source code because "[t]hat is, after all, what this entire problem is about: Who created this product?" Michael Petras, a senior engineer at ACS and one of the code writers of PathFinder, testified that there was "no doubt" that the source code for PathFinder was confidential.

{¶ 46} The source code was so important to ACS that it was part of its negotiations with Leadscope before this litigation. Michael Dennis, CAS's legal-department manager, testified:

> A. We talked about the PathFinder source code and the entire PathFinder project, and we had conversations about how we believed, Pete [Roche] and I, that Leadscope had the enjoyment of the PathFinder software or source code and that as part of the settlement or resolution of this, that Leadscope should provide CAS with any enhancements that they had made to that software.
>
> Q. And when you pointed out that you thought they had the benefit of the PathFinder source code, what did these people say?

A. They never corrected us.

Q. Did they ever deny having the PathFinder source code?

A. No. Which left us with the impression that they had copied some form of the PathFinder software.

{¶ 47} But the jury heard testimony from ACS's own expert that the source codes for PathFinder and the Leadscope patent were not the same. Dr. Sudhakar Yalamanchili testified that "he did not find any" verbatim copying of any source code from PathFinder that was used in Leadscope. Dr. Martin Rinard, Leadscope's expert, confirmed Dr. Yalamanchili's conclusion that the source codes were not identical. He "looked at every line of source code and both source code bases" and concluded that Leadscope's source code was not copied from the PathFinder source code.

{¶ 48} The source code was the only part of PathFinder that was considered highly confidential. The functionality of PathFinder was not proprietary information. Petras conceded that other than the source code, documents were not subject to security procedures for the purpose of protecting confidentiality. In fact, Petras testified that the functionality of PathFinder was not secret and was described to the public in articles and in scientific presentations. The functionality of the PathFinder project was disclosed to customers through sales presentations, without the protection of nondisclosure agreements. And Lou O'Korn, head of ACS's research department, testified that there were other products in the field that had the capabilities of the Leadscope patent and PathFinder. The functionality of PathFinder was unequivocally not a secret.

{¶ 49} ACS did not provide sufficient evidence to the jury supporting its claim for misappropriation or that it had a patent on PathFinder. ACS's only secret was the source code, and expert testimony revealed that the source codes

for PathFinder and Leadscope were not the same. The lack of sufficient evidence of misappropriation is astonishing, especially considering the length of this trial and the extensive nature of the discovery spanning nearly six years.

{¶ 50} But the lack of evidence is even more problematic for ACS's defense of Leadscope's counterclaim alleging that ACS filed the lawsuit solely to injure Leadscope's competitiveness. ACS never specified any information to support its basis for filing the lawsuit. President Massie testified that he formed a working group to investigate the patent. However, the jury never heard testimony about the results of the committee or how it reached its determination that Leadscope had misappropriated the PathFinder product.

{¶ 51} Instead, there were extensive discussions out of the presence of the jury between counsel and the judge regarding Leadscope's motion in limine seeking to introduce evidence of the conclusions of the working group. ACS successfully sought its exclusion on the basis that the information was protected by work-product and attorney-client privilege. Thus, the jury never heard testimony on the information ACS had when it filed its lawsuit to support its claims for misappropriation against Leadscope. This is relevant because in defending the counterclaim involving unfair competition predicated upon legal action, ACS was required to show that when the lawsuit was filed, it had an objective basis and was not filed simply to injure Leadscope's ability to be competitive.

{¶ 52} The evidence that ACS did present to the jury failed to establish that it possessed anything more than speculation at the time it filed its lawsuit that PathFinder had been misappropriated by Leadscope. ACS's own experts and internal technical staff would not state that Leadscope had stolen ACS's trade secrets. Although the experts and internal technical staff identified similarities in the patented information, no testimony established that Leadscope took ACS's proprietary information. Instead, ACS focused its arguments on the similarities

between the source code and "operational flows." ACS relied on those similarities as proof that Leadscope misappropriated PathFinder.

{¶ 53} Dr. Yalamanchili's testimony could not provide any insight as to what information ACS relied upon in filing its claims against Leadscope, given that he was not retained by ACS until 2007, five years after the lawsuit was filed. Dr. Yalamanchili testified that the "operational flow" of the two programs was "identical." But Dr. Yalamanchili never clearly defined "operational flow" or why identical "operational flows" supported ACS's claim of misappropriation. The jury never heard testimony from Dr. Yalamanchili or any other ACS expert that the operational flow constituted proprietary information. Dr. Yalamanchili even admitted he did not review any other software projects beyond PathFinder and Leadscope's patent to determine whether other programs had the same operational flow.

{¶ 54} But Dr. Yalamanchili also testified that the Leadscope patent and PathFinder were different in several ways. He testified that there was no evidence that the PathFinder source codes were the same as Leadscope's. Additionally, the two programs were written in different programming languages. Dr. Yalamanchili also testified that the algorithms of PathFinder and Leadscope were not identical. Thus, ACS's own expert failed to make a convincing case that Leadscope misappropriated ACS's intellectual property.

{¶ 55} Further damaging to its case, ACS's own information technology employees, such as Robert Swann, could not equivocally state that Leadscope had misappropriated PathFinder:

> Q. And you were asked your opinion regarding whether Drs. Blower and Myatt and Mr. Johnson developed Leadscope on their own or whether it was Chemical Abstracts' technology?
> A. On several occasions.

22

Q. And in, in fact—well, what was your response to such questions?

A. Honestly don't know. I could not tell you if they did or did not.

{¶ 56} President Massie also testified that ACS did not bring a lawsuit before Leadscope filed a patent application because it could not tell what, if any, information had been misappropriated:

Q. And if I understand correctly, your testimony earlier, it was, you were not—that [Robert Swann] advised you we couldn't tell without seeing code or independent development, essentially; is that fair to say?

A. I don't know what you mean by "independent development." But I would agree with you that I said to him not only my concerns, but there were a lot of concerns within CAS, a lot of management was talking about this product and worrying about whether anything was taken from us. So I did ask Mr. Swann, what do you think, what do you people in technology think. He said, we can't tell from the outside whether this has our information in it.

* * *

Q. In terms of what you were told at that point in time in April—or in August of—fall of 1999, we can see the screen of the Leadscope project in a fleeting way, perhaps at a meeting; *but we don't know if that source code was our source code unless the guys came over and sat down and said, here's what we did; or if they*

*had given us proof they did their work from scratch and didn't do*
*our work, et cetera.*

   * * *

  A. *I believe that's what I said in an explanation to you of*
*what do we mean we didn't know, and I was giving you an example*
*of the kinds of things that, had we known, we would have a better*
*handle on whether that was our IP.*

  Q. And what you wanted to know was the source code or
proof of independent development?

  A. Those are—those are very good critical examples of
what we need to know.

  THE COURT: Is that what you wanted to know?

  A. It's part of what we wanted to know.

   * * *

  Q. Isn't it fair to say as far as you were concerned the entire
problem was the source code?

  A. No, it's not.

(Emphasis added.)

**{¶ 57}** ACS presented a theory, but offered no concrete evidence that
Leadscope stole its product. On the testimony and evidence presented, ACS
failed to prove that it had any, let alone sufficient, evidence to support its lawsuit.
The record is replete with ACS's speculation, surmise, and supposition, but
wholly lacking of probative evidence from which a rational jury could conclude
that misappropriation actually occurred. The jury could reasonably infer, based
on the paucity of evidence presented, that the lawsuit was objectively baseless
when filed.

**{¶ 58}** Indeed, even during closing arguments, ACS's counsel repeatedly argued that ACS had support for its claims, but failed to identify any evidence it relied on to support its allegation of misappropriation:

> We gave you that evidence that supports the ACS claims. We gave you that evidence in detail. * * * But for defendants to say there is no evidentiary support and that we filed this counterclaim with nothing—excuse me, we filed this suit in April of 2002 with nothing to support it, it defies common sense.

Not so. We conclude that ACS failed to specify any evidence it relied upon in filing its lawsuit. It is therefore not surprising that ACS failed to convince the jury that Leadscope had misappropriated the PathFinder project. Leadscope, on the other hand, presented persuasive evidence that ACS had an intent to harm its business as its motivation in filing the lawsuit.

*2. Leadscope's Evidence*

**{¶ 59}** Leadscope presented evidence that President Massie kept a watchful eye on Leadscope's progress:

> Q. Let's go to 1999. In the year 1999, did you start hearing something about Leadscope which caused you to start having concerns?
>
> A. Yes. There were two things—in—in 1999. First, people were beginning—within CAS were beginning to ask questions about the product that they were putting out, and some uneasiness about the product. And the other issue at the time I remember is they were starting to hire a fair number of our staff, and that began to raise some questions, too.

Q.  Did you begin to ask questions within your organization about whether these defendants had taken any information that they should not have?

A.  Yes.  When someone would say to me, well, we may have a problem here, my response was, well, there's only a problem if they took information away, and does anybody know—does anybody have an idea or anybody know if there's any problem with the product?  Did they taken any of our code?  Did they take any trade secrets?

Q.  Okay.  In 1999, I'm still in that year, did you raise questions with your research group on that subject?

A.  Yes, I asked—I asked Mr. Swann, who was the—who was the head of IT at the time.  I think the title then was director of IT, and Lou O'Korn who worked for him, I asked if they thought there was a problem with this product.

Q.  And what response were you getting from those gentlemen?

* * *

A.  They almost always said the same thing, which is, they couldn't tell from the outside if there was a problem with the product.

Q.  What do you mean by that?

A.  They couldn't tell by just looking—looking at the materials, the—what was public.  They couldn't tell what was underneath the product so they could see if anything of ours was taken.  *I think they uniformly said to me, we just don't know.*

(Emphasis added.)

26

**{¶ 60}** Lou O'Korn eventually met with the president of Leadscope, and O'Korn "was given formal assurances" that Leadscope did not take anything from ACS. But despite these assurances, President Massie's monitoring of Leadscope continued into the next year. In fact, in 2000 President Massie had a telephone conversation with Allen Richon, president of Leadscope, during which he relayed his concerns:

> A. * * * I said to him, Allen, we have two concerns here.
>
> I said, one is this continued unease at CAS about this product you guys have and *just a feeling this—that maybe something was taken from us.*
>
> And I said our second concern is the hiring of CAS staff, which we really don't want to get out of control. * * * He said, as to the product, I can absolutely tell you that this was developed by our people, and there's no intellectual property problem here at all. I said, well, okay if that's your assurance, I said, well, you know, we can get on with life and maybe work together. I said, but you need to know that's a concern of ours.

(Emphasis added.)

**{¶ 61}** Yet President Massie did not "get on with life." He still monitored Leadscope closely. He visited its website and read its articles, although his team continued to tell him that it did not know whether Leadscope took anything:

> A. * * * This would be an ongoing thing where maybe an article would cross my desk or someone would come into my office and say, this—Leadscope is kind of a worry. And I—I would then

ask Bob Swann, you know what do you think we have here and he would say, we don't know.

{¶ 62} When President Massie discovered that Leadscope had filed a patent application in 2001, he "formed a separate group within Chemical Abstracts to investigate Leadscope, the company, the patent, and also the Leadscope product." And, soon after the patent application, President Massie's concerns seemed to transmogrify into ill will.

{¶ 63} In February 2002, in an attempt to abort a visit by Governor Bob Taft to Leadscope's offices, President Massie sent an e-mail to Governor Taft's office. Governor Taft was a "personal friend" of President Massie. In his e-mail, he wrote, according to his testimony:

> Q. "* * * CAS is about to challenge Leadscope's patent on the ground * * * that it is based in significant part on 'prior art' technology, much of it developed at CAS or in existence already in CAS products or elsewhere.
> "* * *
> "There are questions about what the CAS researchers did or did not remove from CAS in terms of code * * * work product, plans, et cetera. While I am not at this time suggesting that anything illegal was done, CAS is reserving its rights to challenge any aspect of Leadscope's product suite or business activities on these grounds."

{¶ 64} The jury also heard testimony from ACS's former information technology director, Robert Swann, about President Massie's hostility toward Leadscope. Swann testified that President Massie seemed to take the Leadscope

situation "very personally" and that he "raised his voice in connection with Leadscope." President Massie even told Swann that Blower was risking his retirement by working with Leadscope. He also made comments about Leadscope's financial situation, stating that Leadscope was going through its money.

{¶ 65} The jury heard testimony that a committee was formed by President Massie to investigate the patent application:

> A. I can absolutely guarantee you that to bring legal action or do anything, we had to have something really substantive, and that didn't happen till this patent came out. And when this patent came out, we were all in shock. I turned the patent over to the general counsel, and then the investigation started, and that's what happened.

{¶ 66} Massie never testified about what happened in the committee's investigation. Swann testified that the allegations that Leadscope took ACS's trade secrets were the conjectures of President Massie. Therefore, beyond mere assertions that the Leadscope patent "looked an awful lot like PathFinder" and that it "was [ACS's] patent," President Massie offered no explanation as to how ACS reached the conclusion that Leadscope misappropriated PathFinder. ACS waited to take any legal action until it could review the patent. But having reviewed it, Massie offered the jury nothing more than his own conclusion that Leadscope misappropriated PathFinder from ACS.

{¶ 67} Once the committee results were turned over to President Massie and the two ACS boards approved pursuing legal remedies against Leadscope, ACS engaged in heavy-handed negotiation tactics. There was no evidence presented to the jury that the two ACS boards reviewed the committee results, and

the committee results were never entered into evidence for the jury's consideration. On April 11, 2002, CAS counsel Michael Dennis called Michael Conley, Leadscope's chief financial officer, demanding a meeting. If Leadscope did not meet, it would face a complaint with "civil and criminal charges." On April 15, 2002, Conley met with ACS representatives, during which they presented him with a draft complaint, including a letter with their demands. The demands included ownership of Leadscope's patent, a $1 million payment, and Leadscope's stopping all sales of products incorporating the disputed patent, in exchange for avoiding litigation.

{¶ 68} Conley responded in an April 16, 2002 letter attempting to avoid litigation. He informed ACS that it was in the midst of securing financing and that "even threatening of this litigation was going to disrupt [Leadscope's] financing." Conley testified, "So, again, it was—it was kind of almost a plea from our part of, why are you doing this, and don't go forward and do this because this is going to really, you know, mess up our company." After Leadscope did not agree to ACS's demands, ACS filed its lawsuit.

{¶ 69} Leadscope also presented evidence that ACS intended to harm it financially by filing a lawsuit. President Massie was aware of Leadscope's delicate financial situation. ACS also became aware of potential investments in Leadscope and derailed those investments.

{¶ 70} For example, Curtis Crocker, a venture capitalist with Battelle Technology Fund, spoke with Michael Dennis at CAS about making an investment in Leadscope and the terms under which the Leadscope founders left Chemical Abstracts. Dennis informed Crocker that ACS had legal issues with Leadscope. After learning about the legal issues, Crocker admitted to Dennis that he "was uncomfortable moving forward" with his investment with Leadscope until the issues were cleared up. Furthermore, Conley testified that he had a conversation with Dennis that "their even threatening of this litigation was going

to disrupt [Leadscope's] financing." Therefore, ACS was aware that it was having a direct impact on Leadscope's financing.

{¶ 71} Leadscope also presented evidence that ACS was attempting to use the lawsuit as a way to impede Leadscope's success and to bankrupt the company and Dr. Blower, Dr. Myatt, and Johnson. For example, after ACS filed suit, Leadscope struggled initially to establish its insurer's duty to advance defense costs. After Leadscope obtained defense via its insurance coverage, ACS dismissed that part of the complaint upon which coverage was predicated, leaving Leadscope without insurer-funded attorneys and coverage in the event it was held liable.

{¶ 72} Having reviewed the foregoing and other evidence, the Tenth District held, "Much of the evidence supported Leadscope's claims that ACS's unfair competition was rooted in its alleged desire to suppress, by any means necessary, Leadscope as a new software competitor." *Am. Chem. Soc.*, 2010-Ohio-2725, ¶ 32. We agree with the appellate court's holding inasmuch as Leadscope, as the counterclaimant alleging unfair competition, had the burden to present evidence to support that claim. It did just that.

{¶ 73} Having independently scoured the voluminous record for other evidence that could support a finding favorable to ACS, we could not find the evidence, in detail or otherwise, upon which ACS relied in bringing its lawsuit. We find that there is no sufficient foundation from which a jury could conclude that ACS adequately supported its claims. Therefore, we agree with the appellate court that the jury's verdict in favor of Leadscope should be upheld. Although the jury's determination was made using the "bad faith" standard, the evidence presented was so lacking that even if the "objectively baseless" standard had been applied, the outcome would have been the same.

{¶ 74} We reach our determination with great respect to a jury's role in the judicial process, but we also recognize that a court of last resort may decide

the merits of a case when it adopts a new legal standard. That result is proper here, given the nature of the claims presented and the fact that a decade has elapsed since the lawsuit was filed. When an appellate court "adopts a new legal standard * * * on * * * [some] occasions, it applies the new standard itself and decides the merits." *Casey v. Planned Parenthood of Southeastern Pennsylvania*, 14 F.3d 848, 857 (3d Cir.1994).[5] And federal appellate courts have used that approach in a wide array of cases, including antitrust claims.

{¶ 75} In *MCI Communications Corp. v. Am. Tel. & Tel.,* 708 F.2d 1081 (7th Cir.1983), a federal antitrust case, the Seventh Circuit Court of Appeals held that the jury instructions did not reflect the proper standard, but because "there is insufficient evidence to support a finding of unlawful pre-announcement under the proper legal standard, we need not remand for a new trial on this issue." *Id*. at 1129, fn. 69.

{¶ 76} The Ninth Circuit has also followed this approach. In *Beck v. Upland*, 527 F.3d 853, 857 (9th Cir.2008), the issue was whether the plaintiff's lawsuit alleging retaliatory arrest pursuant to 42 U.S.C. 1983 could go forward to trial. "After the district court's decision, the United States Supreme Court" issued an opinion "clarifying the elements of a constitutional tort under § 1983 for retaliatory arrest or prosecution." *Id*. The federal court of appeals held that when a new standard of law is decided in a case, " 'the better approach' " is to remand so that the district court can "apply the appropriate standards." *Id*. at 867, quoting *In re Exxon Valdez*, 270 F.3d 1215, 1241 (9th Cir.2001). However, the court held:

> [B]ecause it has already been four years since [the] arrest and three
> years since this case was filed, considerations of judicial efficiency

---

5. Although we recognize that we first adopted the standard in *Greer-Burger*, which was in the context of employee retaliation, we make clear that consistent with its origins, it applies in full for claims of unfair competition by way of malicious litigation.

lead us to resolve the matter today. Justice would not be served by subjecting the parties to further pre-trial disputes over immunity when the matter can be clearly settled on the present summary judgment record.

*Id*. at 867-868.

**{¶ 77}** The principle of fairness requires us in this rare and limited instance to reach this holding, and we do so with great caution and reluctance. Here, a party, Leadscope, was not only successful in its counterclaim for unfair competition, but was also successful in defending against a claim for misappropriation. Because an improper standard was given, some justices would require this successful party to retry this case, but a retrial would be costly to the parties and judicial resources to only reaffirm what a jury properly concluded upon our independent review of the record:  ACS did not establish misappropriation, and Leadscope established unfair competition.

## II. DEFAMATION CLAIM

### A.  *ACS is not liable for defamation because its statements were not defamatory as a matter of law*

1. *The Internal Memorandum*

In Ohio, defamation occurs when a publication contains a false statement "made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession."

*Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 9 quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Const. Trades Council*, 73 Ohio St.3d 1, 7, 651 N.E.2d 1283 (1995).

> To establish defamation, the plaintiff must show (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement.

*Pollock v. Rashid*, 117 Ohio App.3d 361, 368, 690 N.E.2d 903 (1996).

{¶ 78} "[I]t is for the court to decide as a matter of law whether certain statements alleged to be defamatory are actionable or not." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 6 Ohio St.3d 369, 372, 453 N.E.2d 666 (1983).

{¶ 79} "In determining whether a statement is defamatory as a matter of law, a court must review * * * the totality of the circumstances" and by "read[ing] the statement[] * * * in the context of the entire [publication] to determine whether a [reasonable] reader would interpret [it] as defamatory." *Mann v. Cincinnati Enquirer*, 1st Dist. No. C-09074, 2010-Ohio-3963, ¶ 12, citing *Scott v. News-Herald*, 25 Ohio St.3d 243, 253, 496 N.E.2d 699 (1986), and *Mendise v. Plain Dealer Publishing Co.*, 69 Ohio App.3d 721, 726, 591 N.E.2d 789 (1990).

> [T]he words of the publication should not be considered in isolation, but rather within the context of the entire [publication] and the thoughts that the [publication] through its structural implications and connotations is calculated to convey to the reader to whom it is addressed.

*Connaughton v. Harte Hanks Communications, Inc.*, 842 F.2d 825, 840 (6th Cir.1988), *aff'd*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

**{¶ 80}** Reading ACS's statements made in the internal memorandum in context, we readily conclude that they are not defamatory as a matter of law. The internal memorandum was simply a directive to all employees from CAS's legal administration manager not to speak about the litigation. It was understandable and reasonable for the legal administration manager to disseminate an internal memorandum regarding an important legal matter to employees. In order for the directive to be effective, the litigation had to be described in sufficient detail. Considering the memorandum as a whole and considering the fact that the statements in the memorandum were almost a verbatim recitation of the allegations in the complaint, we hold that the statements are not defamatory and are not actionable.

### 2. *The Business First Article*

**{¶ 81}** Business First, a newspaper serving the corporate community, reported on the filing of the ACS lawsuit and the allegations made by ACS. The article, entitled "LeadScope, its founders sued by former employer," contained a balanced report of both parties' arguments and defenses. The alleged defamatory statements made by ACS's outside counsel in the article pertained to ACS's intent in filing the lawsuit: "Our motivation in filing suit is to acquire back the protected information that they took from us."

**{¶ 82}** Business First gave the parties an opportunity to comment on the case and, in fact, both parties took advantage of that opportunity. The first sentence of the article states that ACS is "alleging [that Leadscope and its founders] used proprietary information to form and operate their business." Thus, a reasonable reader would understand that ACS's counsel's statements were a quick summary of the case and ACS's allegations.

{¶ 83} For its part, Leadscope stated that the lawsuit "has no merit." The article also contained extrajudicial statements by Leadscope's counsel that "[t]he timing of this lawsuit speaks volumes as to its invalidity" and Leadscope's intention to file a counterclaim. Leadscope's counsel stated that even though ACS had been aware of the fact that "Leadscope ha[d] been working up its new products for about four or five years [and] ha[d] acquired about $10 million in venture capital," ACS did not "utter[] a peep for four or five years."

{¶ 84} From the views presented in the article, the average reader would learn that the suit had been filed and could easily understand the gist of the claims and defenses from the brief quotes that the parties provided regarding their opinions about the lawsuit.

{¶ 85} Moreover, the lawsuit was not under seal, and the complaint was available to the public. The public has a legitimate, constitutionally protected interest in judicial proceedings, and the article provided information to educate and inform the public about the case.

{¶ 86} Considering the article as a whole and the fact that the article contained a true and accurate summary of the legal proceedings at the time, we hold that the statements in the article are, as a matter of law, not defamatory. Thus, we must reverse the judgment of the court of appeals to the extent it held otherwise.

{¶ 87} Even though we hold that the statements published in Business First are not defamatory as a matter of law, we must also address the significance of the fact that ACS was held liable for statements made by its outside counsel to the media. Client liability for an attorney's statements is an issue of first impression for this court.

{¶ 88} Although we have not confronted the discrete issue here, courts outside of Ohio have done so. The better reasoned opinions hold that a client may be vicariously liable for its attorney's torts only if the client authorized or ratified

36

the conduct. *See, e.g.*, *Givens v. Mullikin*, 75 S.W.3d 383, 394-396 (Tenn.2002) (an insurer and an insured may be held vicariously liable for the tortious acts or omissions of an attorney hired to defend the insured if the attorney's tortious actions were directed, commanded, or knowingly authorized by the insurer or by the insured); *Chisler v. Randall,* 124 Kan. 278, 259 P. 687, 690 (Kan.1927) ("The client is not responsible for unauthorized defamatory communications made by his attorney"); *Green Acres Trust v. London*, 142 Ariz. 12, 18-19, 688 P.2d 658, (Ariz.App.1983), *vacated in part on other grounds*, 141 Ariz. 609, 688 P.2d 617 (1984) (a client was not liable for defamation when there was an absence of any evidence of either authorization or ratification of the attorneys' statements); *Arigno v. Murzin*, Conn.Super.Ct. No. CV960474102S, 2001 WL 1265404, *9 (Oct. 2, 2001) (a client was vicariously liable for an attorney's statements that went beyond reading charges against the opposing party because the client apparently authorized the statements).

{¶ 89} We agree. Based on the foregoing authority, we hold that a client is vicariously liable for its attorney's defamatory statements only if the client authorized or ratified the statements. To hold otherwise would wreak havoc on the bench and bar, as well as clients.

{¶ 90} We make clear that Ohio law imposes no blanket prohibition on an attorney's communications to the media. Attorneys and their clients retain a panoply of First Amendment rights and are free to speak to the public about their claims and defenses provided that they do not exceed the contours of protected speech and ethical rules that impose reasonable and necessary limitations on attorneys' extrajudicial statements. *See* Prof.Cond.R. 3.6 ("A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the

matter"). Thus, while we do not muzzle an attorney representing a party in a proceeding, attorneys are not given carte blanche to defame others under the guise of litigation.

{¶ 91} In this case, the jury was given only an instruction on the law of defamation. It was not instructed to determine whether ACS was vicariously liable for its attorney's statements. And there was no evidence before the jury that ACS had endorsed or ratified its counsel's statements. Thus, the verdict against ACS could not stand even if its attorney's statements could be held to be defamatory. We caution trial courts that, in the future, they must instruct the jury regarding client authorization or ratification in cases in which claims for defamation are predicated on extrajudicial statements made by the client's attorney.

## B. *Damages*

{¶ 92} Because we hold today that ACS's statements in the internal memorandum and Business First were not defamatory as a matter of law, we reverse the judgment of the appellate court that upheld the jury's verdict and the jury's award of damages on the defamation claim.

## III. CONCLUSION

{¶ 93} Because we hold that the appropriate standard for an unfair competition claim predicated upon malicious litigation is the two-part test set forth by the Supreme Court in *Professional Real Estate Investors*, we hold that the trial court and court of appeals applied the wrong standard in deciding whether ACS brought its claims in good faith. The United States Constitution and the Ohio Constitution do not necessarily preclude claims grounded simply in bad faith. What is precluded are lawsuits that are objectively baseless and filed with the subjective intent to injure the party's ability to be competitive.

{¶ 94} In this case, the evidence presented by Leadscope overwhelmingly supported the jury's verdict on Leadscope's unfair competition counterclaim.

Meanwhile, ACS's misappropriation claim was completely devoid of evidence that would have supported its claim for misappropriation. Leadscope's vast evidence, coupled with ACS's lack of support for its claim, compels us to hold that even if the jury had been instructed properly, the result would be the same. We therefore affirm the portions of the judgment in favor of defendant Leadscope on the misappropriation claim and in favor of the counterclaimant Leadscope on its counterclaim.

{¶ 95} Finally, we hold that ACS's statements in the internal memorandum and its attorney's statements in Business First are not defamatory as a matter of law. We also hold that a client is vicariously liable for its attorney's defamatory statements only if the client authorized or ratified the statements. Therefore, we reverse that part of the judgment of the appellate court that upheld the jury's verdict and the jury's award of damages on defamation.

{¶ 96} The cause is remanded to the trial court with orders to vacate its judgment for Leadscope on the issue of defamation.

Judgment affirmed in part
and reversed in part,
and cause remanded.

LANZINGER and MCGEE BROWN, JJ., concur.

PFEIFER, J., concurs in part one of the judgment and dissents in all other respects.

LUNDBERG STRATTON and O'DONNELL, JJ., concur in all syllabus paragraphs and in part two of the judgment and the portion of the opinion relating thereto, and dissent as to part one of the judgment.

CUPP, J., concurs in paragraph one of the syllabus and dissents in all other respects.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 97} I concur in the majority's judgment affirming the appellate court's judgment on appellees' unfair-competition claims. I do not concur in the majority's determination that a legal action must be objectively baseless to form the foundation of an unfair-competition claim based upon malicious litigation. Further, I dissent from the entirety of the majority's holding regarding the appellees' defamation claims and would affirm the judgment of the court of appeals on those claims.

**I**

**Defamation**

{¶ 98} The jury carefully considered five separate alleged instances of defamation. Jurors decided that two of those statements were defamatory, that the American Chemical Society ("ACS") had made those statements with malice, and that defendants had suffered damages. The majority seeks to thwart the jury's verdict by imposing its own verdict.

Publicity as a Weapon

{¶ 99} On April 11, 2002, Michael Dennis, the senior lawyer at Chemical Abstract Service ("CAS"), called Michael Conley, Leadscope's chief financial officer, requesting a meeting—a meeting at which ACS would eventually demand Leadscope's patent and $1 million. Dennis threatened to bring "both [a] civil and criminal complaint" and "fast and furious publicity" if Leadscope refused to meet with ACS. When Leadscope did not accede to ACS's settlement demands, ACS unleashed its destructive, two-pronged strategy—litigation and publicity. The publicity proved the more devastating.

{¶ 100} A jury spent weeks hearing testimony about Leadscope's path from innovation to devastation. The jury found that, by far, Leadscope had been harmed the most by the publication of defamatory statements made by ACS. The verdicts and interrogatories are attached to this opinion as an appendix. Even

though the jury found that Leadscope had proven claims for tortious interference and unfair competition, nearly 70 percent of the damages awarded by the jury to Leadscope were attributable to the defamatory statements of ACS. For the individual plaintiffs, the jury found that as far as general damages were concerned, Blower, Johnson, and Myatt suffered damages equally from the unfair competition and the defamation.

{¶ 101} It should be no surprise that ACS's comments about Leadscope and its founders, especially to the particular audiences it chose, were devastating. ACS, a venerable institution chartered by Congress, the world's largest scientific society with over 164,000 members and self-described as "one of the world's leading sources of authoritative scientific information," accused three of its former employees of stealing technology from CAS. The jury, like ACS, realized the import of that type of accusation. That purveyor of "authoritative scientific information" announced to the 1,900 employees of ACS—employees who were colleagues, competitors, and potential customers of Leadscope and its founders— that Leadscope and its founders had "sought and received a patent for technology indistinguishable from a project on which they worked while employees of the Society's Chemical Abstracts Service" and that ACS would act "to protect its intellectual property and proprietary information." ACS then admonished the 1,900 people that it just notified of the lawsuit to not comment upon it to anyone else.

{¶ 102} Ten days later, ACS ignored its own advice and spoke, through its attorney, to Columbus's Business First, a business-oriented newspaper. To a reporter from the business newspaper of Leadscope's home town, a town where Leadscope had been attempting to raise capital, ACS essentially said that Leadscope's central product was stolen from ACS.

{¶ 103} ACS, "one of the world's leading sources of authoritative scientific information," announced to an audience that included the scientific

world and the financial world that virtually everything that Leadscope was built upon was stolen. A few words to the right audience can be ruinous. And the jury determined that those words were ruinous to Leadscope, Blower, Johnson, and Myatt. The majority has not demonstrated why those jury verdicts should not stand.

## Legal Standard

{¶ 104} The law on defamation is not complicated. As the majority relates, defamation occurs when a publication contains a false statement made with some degree of fault that reflects injuriously on a person's reputation or affects a person adversely in his trade, business, or profession. *Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 9. The majority, however, finds that the statements made by ACS are not defamatory, despite the fact that the claims of Leadscope and the individual defendants were not wanting as to any element necessary to prove defamation. And the majority does not assert that any privilege applies to ACS. In both instances—the employee memorandum and the Business First article—the statements made by ACS were false, were made with the knowledge that they were false, injured the reputations of Leadscope and the individual defendants, and adversely affected them in their business.

## A

## Business First Article

{¶ 105} The jury awarded damages based on a statement from ACS's counsel in the May 11, 2002 edition of Business First. The statement reads, "Our motivation in filing suit is to acquire back the protected information that they took from us." ACS's counsel demonstrated no equivocation. He did not claim to be quoting the complaint. He said that the defendants had taken protected information from ACS. That statement was false, ACS knew it was false, and it

injured Leadscope and the individual defendants. The majority concocts novel legal theories to save ACS from the jury's verdict.

### 1. ACS Is Not a Newspaper

{¶ 106} The majority cites four cases involving *newspapers* as defendants in support of its statement that a court must review the statement at issue under the totality of the circumstances and within context: *Mann v. Cincinnati Enquirer*, 1st Dist. No. C-09074, 2010-Ohio-3963, ¶ 12, citing *Scott v. News-Herald*, 25 Ohio St.3d 243, 253, 496 N.E.2d 699 (1986); *Mendise v. Plain Dealer Publishing Co.*, 69 Ohio App.3d 721, 726, 591 N.E.2d 789 (1990); and *Connaughton v. Harte Hanks Communications, Inc.*, 842 F.2d 825, 840 (6th Cir.1988), *aff'd* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Those cases actually say that the court must look to the entire "article"—the majority substitutes the word "publication"—to determine whether the statements at issue are defamatory. That is, when a newspaper is being sued for statements appearing in an article, the court should look at everything the newspaper published in the article in determining whether the statements at issue were defamatory. The newspaper, when *it* is being sued, gets credit for *its* attempt to balance the allegedly defamatory statements with other material. In discussing context, the court in *Scott* said:

> To evaluate an article's broader context we must examine the type of article and its placement in the newspaper and how those factors would influence the reader's viewpoint on the question of fact or opinion.

*Scott v. News-Herald* at 253. ACS was not making editorial decisions. It was simply making defamatory statements.

{¶ 107} The majority cites newspaper cases that simply do not apply to ACS. For instance, the majority quotes *Connaughton* as saying, "[T]he words of the publication should not be considered in isolation, but rather within the context of the entire [publication] and the thoughts that the [publication] through its structural implications and connotations is calculated to convey to the reader to whom it is addressed." *Id.* at 840.

{¶ 108} When one views that quote as part of the entire sentence as it appeared in *Connaughton*, it is clear that the case is discussing the newspaper's entire process in putting a story to print:

> Other factors to be scrutinized are conversations between the editor and/or other management personnel with reporters, or the author of the article, concerning the research and development of a controversial story; decisions and reasons relating to selective interviews and selective investigations; the manner of implementing interviews; the importance and veracity of information relied upon in developing the article, always mindful of the caveat that the words of the publication should not be considered in isolation, but rather within the context of the entire article and the thoughts that the article through its structural implications and connotations is calculated to convey to the reader to whom it is addressed.

*Id.* at 840.

{¶ 109} Business First is not being sued here. If it were, Business First would get credit for the "balanced report of both parties' arguments and defenses" that the majority claims Business First gave. ACS, on the other hand, is responsible for its lawyer's words. Business First reported what ACS's counsel

said; ACS does not get the benefit of the nonparty newspaper's attempt at writing a balanced story.

### 2. The Defamed Party's Opportunity to Deny the Defamatory Statement Does Not Make the Statement Nondefamatory

{¶ 110} The majority states that the Business First article "contained a balanced report of both parties' arguments and defenses." The majority excuses ACS's defamatory statement because it was balanced by Leadscope's assertion in the article that the lawsuit "has no merit." This is a novel approach to defamation law–if the victim denies the defamatory statement, the defamer is shielded from liability because the statement is not defamatory. Does the majority really mean that?

{¶ 111} It may be the case that the chance to publicly deny the veracity of a defamatory statement might affect the amount of *damages* a plaintiff may recover. But the opportunity to defend one's good name cannot mean that the defamatory statement itself was not defamatory. It just cannot.

### 3. A Statement About Litigation Is Qualifiedly Privileged

{¶ 112} Parties to a lawsuit are protected from claims of defamation related to discussions about that lawsuit—but it is a qualified privilege. This privilege is codified at R.C. 2317.05 and provides that a "fair and impartial report" of the allegations made in a lawsuit is protected by a qualified privilege that can be overcome by a showing of actual malice. The fact that a statement accurately reports the contents of litigation does not render the statement "not defamatory"—it only entitles the speaker to a qualified privilege, which can be overcome by a showing of actual malice.

{¶ 113} The jury was instructed that ACS's comments in Business First were qualifiedly privileged in this case. The jury was also instructed that actual malice occurs "when the [declarant] makes a false statement either with knowledge that it is false or with reckless disregard of whether it is false or not."

{¶ 114} The jury found that ACS, through its counsel, had made with actual malice the statement alleging that defendants had stolen something from ACS. That was enough to overcome the privilege that applies to statements regarding litigation in Ohio.

4. Client Authorization or Ratification

{¶ 115} The majority's discussion of a client's vicarious liability for the statements of its attorney is superfluous, given its holding that the statements made by ACS's attorneys were not defamatory. That discussion is also superfluous because it has nothing to do with this case. ACS makes no claim that it had not authorized or ratified the statements of its attorney in the Business First article. Instead, it attempted to persuade this court in its briefing that the statements were fair commentary on the lawsuit, that the "statements at issue * * * stay well within the allegations made in the complaint, and it is in fact difficult to envision an 'accurate summary of the allegations' that would be more restrained." Can we not presume that ACS ratified or authorized the statements in the complaint? Should this court reverse a $15 million verdict on a theory not raised by the appellant at trial or on appeal, a theory that would have been dismissed by the jury out of hand?

{¶ 116} Ohio attorneys would have nothing to fear from a holding in favor of appellees. Attorneys should note well that they may speak out about a pending lawsuit with no threat of liability as long as they do not make a false statement either with knowledge that it is false or with reckless disregard of whether it is false or not. They retain an absolute privilege for whatever they file or say in court, *Willitzer v. McCloud*, 6 Ohio St.3d 447, 448-449, 453 N.E.2d 693 (1983), but they cannot expect to avoid liability for lying in public just because they first have lied in a complaint.

B

Memorandum to Employees

**{¶ 117}** ACS's memorandum to all its employees regarding the litigation was the second basis upon which the jury found that ACS had defamed the defendants. The memorandum (which reads more like a press release) was sent to approximately 1,900 employees around the globe, including Europe and Asia, including employees having nothing to do with the case. It read:

Re: Communication re: Legal Matter

*The nonprofit American Chemical Society has filed a legal complaint against Leadscope, Inc., and its founders, who sought and received a patent for technology indistinguishable from a project on which they worked while employees of the Society's Chemical Abstracts Service in the mid-1990s.*

The Society is a leader in publishing scientific journals and databases that are indispensable to chemists around the globe, and is acting to protect its intellectual property and proprietary information.

Staff members are not authorized to comment on this matter. It is important that you refrain from communicating and/or commenting about this subject to any individual while the legal process is being pursued.

(Emphasis added.)

**{¶ 118}** ACS, which had threatened "fast and furious publicity," released this memo to people in the same industry as defendants, alleging that defendants had sought their patent fraudulently. The statement that Leadscope and its founders had "received a patent for technology indistinguishable from a project

on which they worked while employees of the Society's Chemical Abstracts Service" was false, ACS knew it was false, and it injured Leadscope and the individual defendants.

{¶ 119} The majority goes along with the fiction that "[t]he internal memorandum was simply a directive to all employees from ACS's counsel to not speak about the litigation." Could it instead have been an effort to get as many people in the industry talking about the lawsuit as possible?

{¶ 120} Regardless, the majority states that "[c]onsidering the memorandum as a whole and considering the fact that the statements in the memorandum were almost a verbatim recitation of the allegations in the complaint, we hold that the statements are not defamatory." Majority opinion at ¶ 80. To the contrary, a consideration of the memorandum as a whole does nothing but lead to a conclusion that the memorandum *is* defamatory. Nothing in the remainder of the memorandum softens the salvo from the opening paragraph that defendants' product's technology was indistinguishable from that of a project they worked on at CAS. There is nothing saying "we allege" or "we think"—the reader is led to believe that ACS has compared the guts of the two projects and found they were identical, that ACS's only option is to go to war because of what it has found. The jury determined that was not true.

{¶ 121} That the memorandum went to employees and involved litigation was relevant, but not determinative. Again, ACS enjoyed a qualified privilege for the statements made in the memorandum. But a falsehood contained in a legal complaint when repeated outside of that complaint does not enjoy an absolute privilege.

{¶ 122} This jury found that ACS had acted with actual malice in the publication of the employee memorandum. Again, the majority ignores the jury's determination.

C

Conclusion on Defamation

{¶ 123} ACS levied the most serious accusation that can be brought against an inventor: you stole your invention. For the majority to determine that those words are not defamatory is unfathomable. This is not an instance where a court has been asked to determine whether a statement is simply rhetoric, satire, or hyperbole and thus not defamatory. There is no way to paint the comments at issue in this case as anything other than defamatory. There is no privilege extensive enough to protect ACS from liability for those statements. The statements were well chosen, well timed, and well placed by ACS to achieve their maximum effect. Leadscope and its founders were profoundly damaged. But ACS pays no price for its defamatory statements because they were more or less reflective of statements contained in its complaint. The majority excuses ACS for its published lies to the scientific community and financial community because it had first lied to a federal court. Such is the reasoning when a result goes in search of a justification.

II

**Unfair Competition Based upon Malicious Litigation**

{¶ 124} I concur in the majority's holding that the appellees proved their case for unfair competition based upon malicious litigation even under the standard of law that the majority says should have been in place in this case. I do not concur with the majority that under Ohio law, the *Noerr-Pennington* doctrine establishes the elements of a claim for unfair competition based upon malicious litigation. *See E. RR. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

A

Unfair Competition

{¶ 125} First, I would hold that this court need not even address ACS's appeal regarding malicious litigation. The individual defendants and Leadscope alleged that ACS had engaged in unfair competition through *three* means: malicious litigation, circulation of false statements and rumors about the defendants, and false disparagement of individual defendants. The jury returned a general verdict against ACS in favor of all the defendants; a jury interrogatory asked on which grounds the jury had found for the defendants on the unfair competition issue. The jury answered that ACS had engaged in unfair competition in each of the three separate ways the defendants had alleged. In the award of damages for the unfair-competition claims, there was no breakdown as to how much the jury awarded under each theory.

Two-Issue Rule

{¶ 126} This court in *Water Mgt., Inc. v. Stayanchi*, 15 Ohio St.3d 83, 85, 472 N.E.2d 715, 717 (1984), recognized that "[t]he concept of unfair competition may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." This court cited *Henry Gehring Co. v. McCue*, 23 Ohio App. 281, 283-284, 154 N.E. 171 (8th Dist.1926) in support of that statement. The majority opinion addresses only the malicious litigation aspect of the defendants' unfair-competition claims; it does not address the claims and jury verdicts for the defendants that were based upon circulation of false statements and rumors about defendants or false disparagement of individual defendants. The trial court provided separate instructions for those claims, and the jury made discrete findings as to each and recorded those findings in its answer to an interrogatory.

**{¶ 127}** Due to the two-issue rule, there is no need for this court to even address the malicious-litigation portion of defendants' unfair-competition claims. Under the two-issue rule, if there is a general verdict and more than one theory of liability, the verdict stands if one of the theories of liability was tried without error:

> This rule as generally applied is that, where there are two causes of action, or two defenses, thereby raising separate and distinct issues, and a general verdict has been returned, and the mental processes of the jury have not been tested by special interrogatories to indicate which of the issues was resolved in favor of the successful party, it will be presumed that all issues were so determined; and that, where a single determinative issue has been tried free from error, error in presenting another issue will be disregarded.

*H.E. Culbertson Co. v. Warden,* 123 Ohio St. 297, 303, 175 N.E. 205 (1931).

**{¶ 128}** Here, we do not even have two separate causes of action; instead, the jury was presented with three ways it could find that ACS had engaged in unfair competition. The jury found in favor of the defendants on three variations of the same tort. That an error was alleged as to one of those theories is irrelevant under the two-issue rule. According to the jury, ACS was liable to the defendants for unfair competition. The general damages verdict on unfair competition was not tested by interrogatories. Even if the malicious-litigation aspect of defendants' claim were reversed, the general verdict remains, supported by the remaining findings of unfair competition. The jury verdict on unfair competition should therefore stand regardless of this court's decision on the malicious-litigation issue.

B

Malicious Litigation

1. ACS Waived *Noerr-Pennington* Immunity and Thus Any Requirement

That the Defendants Prove ACS's Claims Were "Objectively Baseless"

{¶ 129} The majority opinion states that in this case, "the jury instructions were inadequate because they did not include the 'objectively baseless' element necessary to meet the two-part test for an unfair competition claim." But no Ohio case has ever required that the litigation brought by a malicious-litigation defendant be "objectively baseless." *See, e.g., Henry Gehring Co. v. McCue,* 23 Ohio App. at 283-284, 154 N.E. 171; *Harco Corp. v. Corrpro Cos., Inc.*, 9th Dist. No. 1465, 1986 WL 12338, *3 (Oct. 29, 1986); *Microsoft Corp. v. Action Software,* 136 F.Supp.2d 735, 739 (N.D.Ohio 2001). The majority's statement about a "two-part test for an unfair competition claim" demonstrates a fundamental misunderstanding.

{¶ 130} As the majority relates, those magic words—"objectively baseless"—come from *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc. ("PREI"),* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), a case applying the *Noerr-Pennington* Doctrine. *PREI*, however, does not establish a two-part test for malicious prosecution. Rather, it establishes a two-part test for defeating a claim of *Noerr-Pennington* immunity. "[T]he Noerr-Pennington doctrine, as it has evolved, is an affirmative defense which exempts from anti-trust liability any petitioning activity designed to influence legislative bodies or governmental agencies." *North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 52 (4th Cir.1981). ACS seeks to extend *Noerr-Pennington* immunity in this case to make it immune from liability for filing suit against the defendants.

{¶ 131} *PREI* establishes that a party claiming immunity may still be liable if the suit at issue constituted "sham litigation." Under *PREI*, litigation

cannot be deprived of immunity as a sham unless it is objectively baseless. *PREI* at 60.

**{¶ 132}** Parties claiming immunity from liability pursuant to the *Noerr-Pennington* Doctrine must raise that alleged immunity as an affirmative defense. *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 860 (5th Cir.2000). Once the malicious-litigation defendant "assert[s] *Noerr-Pennington* as an affirmative defense, [the plaintiff] 'has the burden of proving that its [opponent's] conduct was a sham.' *IGEN Internatl., Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 312 (4th Cir.2003), quoting *Hosp. Bldg. Co. v. Trustees of Rex Hosp.,* 791 F.2d 288, 293 (4th Cir.1986)." However, ACS never asserted that it had *Noerr-Pennington* immunity from liability in this action. Thus, defendants were under no burden to establish that ACS's claims constituted sham litigation under *PREI*.

**{¶ 133}** Since *Noerr-Pennington* immunity is an affirmative defense, ACS was bound by Civ.R. 8(C) (affirmative defenses) to plead it in a responsive pleading. Of course, it did no such thing. It waived the defense; ACS did not even mention objective baselessness or the *Noerr-Pennington* Doctrine until its motion for judgment notwithstanding the verdict, two weeks after the conclusion of the trial. Now, after ignoring *PREI*, a United States Supreme Court case decided nearly a decade before this litigation started, ACS wants to retroactively make it control this case.

2. The *Noerr-Pennington* Doctrine Is Not a Part of

Ohio Unfair-Competition Law

**{¶ 134}** What ACS failed to assert as an affirmative defense—*Noerr-Pennington* immunity—it now seeks to shoehorn in as necessary proof of a claim for unfair competition. ACS was thus left to claim to this court that objective baselessness has always been a part of malicious-litigation law in Ohio.

**{¶ 135}** But it has never been a part of malicious-litigation law in Ohio. *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174,

is by no means an unfair-competition case and is inapposite. In *Greer-Burger*, at paragraph two of the syllabus, this court applied the sham litigation analysis from *PREI* to determine that the government, specifically the Ohio Civil Rights Commission ("OCRC"), could not prevent an employer from suing an employee over damages the employer suffered from the employee's unsuccessful discrimination claim. In *Greer-Burger*, the employer was prevented by an order of the OCRC from even bringing his claim; he was actually denied access to the courthouse. *Id*. at ¶ 16. ACS, on the other hand, has not been prevented from seeking redress against the defendants. It had its day in court. It wants something completely different—to be held harmless for any damage it may have caused defendants by bringing its claims.

{¶ 136} The test for sham litigation in *PREI* arises once a party claims immunity from liability. It is not a part of a test for malicious litigation. That is why ACS never raised it below. That is why we should not apply it in this case.

C

Conclusion on Unfair Competition Based upon Malicious Litigation

{¶ 137} Although I do not agree with the majority that *PREI*, a case not raised by ACS until after the conclusion of the trial, controls the law in Ohio on unfair competition based upon malicious litigation, I do agree with the majority that defendants proved that ACS's claims were objectively baseless under that standard and that the jury verdicts on appellees' unfair-competition claims should stand. Thus, I concur in the majority's decision affirming the judgment of the court of appeals on appellees' unfair-competition claims.

————————————

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

{¶ 138} I concur in the majority's holding that defines the proper tests for unfair competition and defamation and in the majority's holding that the actions of American Chemical Society ("ACS") were not defamatory as a matter of law. I dissent only because I would remand the unfair-competition claim of Leadscope, Inc., for a new trial, as opposed to deciding that issue in this court. Therefore, I respectfully concur in part and dissent in part.

{¶ 139} The trial court provided the jurors the following instruction regarding Leadscope's unfair-competition claim: "In Ohio, unfair competition may consist of malicious acts by way of litigation that is not founded in good faith, but is for the purpose of harassing and injuring a rival producing and selling the same commodities." The jury returned a verdict in favor of Leadscope on its unfair-competition claim, and the court of appeals affirmed.

{¶ 140} We hold that the trial court's jury instructions pertaining to Leadscope's unfair-competition claim "were inadequate because they did not include the 'objectively baseless' element necessary to meet the two-part test for an unfair competition claim." However, rather than remanding the cause for a new trial for a jury to apply the correct instructions, the majority reviews the evidence and affirms the judgment of the court of appeals after finding that Leadscope would prevail on its unfair-competition claim against ACS under the new instructions.

{¶ 141} "[I]t is a fundamental tenet of jury trial procedure that the judge decides questions of law, and the jury, as factfinder, then decides questions of fact." *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 436, 659 N.E.2d 1232 (1996). The jury is in the best position to judge the credibility of witnesses because the jury " ' "is best able to view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *State v. Ross,* 9th Dist. No.

09CA009742, 2012-Ohio-536, ¶ 42, quoting *State v. Cook,* 9th Dist. No. 21185, 2003-Ohio-727, ¶ 30, quoting *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 659, 626 N.E.2d 1017 (8th Dist.1993). "The jury alone, as the trier of fact, has the duty to decide what weight should be given to the testimony of any expert witness." *Kokitka v. Ford Motor Co.,* 73 Ohio St.3d 89, 652 N.E.2d 671 (1995), paragraph two of the syllabus. Thus, the "weight to be given evidence and the credibility of witnesses are jury issues." *State v. Jamison*, 49 Ohio St.3d 182, 191, 552 N.E.2d 180 (1990), citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 142} In rendering a verdict in favor of Leadscope regarding its unfair-competition claim, the jury in this case considered only whether ACS acted in bad faith. Pursuant to our holding herein, the jury should have also considered whether ACS's complaint alleging that Leadscope appropriated trade secrets was objectively baseless. But it will never have that opportunity because the majority has reached its own conclusion. In my opinion, the majority improperly reviews and weighs the evidence, including expert testimony, presented by both ACS and Leadscope, in concluding that there is sufficient evidence to support Leadscope's unfair-competition claim against ACS. I believe that the majority has usurped the jury's duties of weighing and determining the credibility of evidence. I would remand this case for a new jury trial regarding Leadscope's counterclaim for unfair competition. As we stated in *State v. Petro*, 148 Ohio St. 473, 501, 76 N.E.2d 355 (1947), "[i]t is the minds of the jurors and not the minds of the judges of an appellate court that are to be convinced."

{¶ 143} Therefore, while I concur in the majority's substantive holding, I would remand this cause for a new trial on Leadscope's unfair-competition claim. Accordingly, I concur in part and dissent in part.

O'DONNELL, J., concurs in the foregoing opinion.

————————————

**CUPP, J., concurring in part and dissenting in part.**

{¶ 144} I concur in paragraph one of the syllabus and agree that for a party to succeed on a claim of unfair competition based on an opposing party's filing of a legal action, the party asserting the claim must establish both that the legal action is objectively baseless and that the opposing party had the subjective intent to injury the party's ability to be competitive. I am unable to agree, however, that the jury's determination on this claim can be affirmed as a matter of law upon this court's own review of the record in our application of the correct standard. As explained in Justice Lundberg Stratton's separate opinion, this cause should be remanded to the trial court for further proceedings on the unfair-competition claim.

{¶ 145} I agree with much, but not all, of the legal analysis contained in Justice Pfeifer's separate opinion regarding the defamation claims. The two allegedly defamatory occurrences specifically at issue gave rise to jury questions as to whether the statements were indeed defamatory, and the jury's conclusions that they were defamatory are entitled to deference. As the appellate court stated in affirming on the defamation claims, sufficient evidence was presented "upon which the jury could find by clear and convincing evidence that ACS published the statements * * * with actual malice" to overcome any privilege that attached. *Am. Chem. Soc. v. Leadscope*, 10th Dist. No. 08AP-1026, 2010-Ohio-2725, ¶ 61. I would affirm the judgment of the court of appeals as to the defamation issues.

_____

Vorys, Sater, Seymour and Pease L.L.P., Michael G. Long, and Kimberly Weber Herlihy; and Jenner & Block L.L.P., David W. DeBruin, Matthew S. Hellman, Lindsay C. Harrison, and Matthew E. Price, for appellant.

Squire, Sanders & Dempsey (US) L.L.P., Alan L. Briggs, Aneca E. Lasley, Christopher F. Haas, Pierre H. Bergeron, and Colter Paulson, for appellees.

Michael DeWine, Attorney General, Alexandra T. Schimmer, Solicitor General, and David M. Lieberman, Deputy Solicitor, urging reversal for amicus curiae state of Ohio.

Jones Day, Douglas Cole, and Mathew A. Kairis, and Linda Woggon, urging reversal for amicus curiae Ohio Chamber of Commerce.

Bricker & Eckler and Anne Marie Sferra, urging reversal for amici curiae Ohio Manufacturers' Association and Ohio Council of Retail Merchants.

Eugene P. Whetzel, urging reversal for amicus curiae Ohio State bar Association.

_____

**THE APPENDIX TO JUSTICE PFEIFER'S
CONCURRING AND DISSENTING OPINION
APPEARS ON THE FOLLOWING PAGES.**

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

THE AMERICAN CHEMICAL SOCIETY :
                                :   Case No. 02 CVC-07-7653
        Plaintiff,              :
                                :
    v.                          :
                                :   Judge Guy L. Reece II
LEADSCOPE, INC. et al.,         :
                                :
        Defendants.             :

## INTERROGATORY NO. 1

If your answer to any question in section 3 (defamation) of the Verdict Form is "Yes," please indicate on which one or more of the following statement(s) your finding of defamation was based.

| | | |
|---|---|---|
| February 5, 2002 email | Yes ____ | No X |
| April 10 or 11, 2002 Crocker telephone call | Yes ____ | No X |
| May 1, 2002 memorandum | Yes X | No ____ |
| May 10, 2002 Business First article | Yes X | No ____ |
| October, 2005 Nature article | Yes ____ | No X |

(Six of Eight Must Agree)

SUPP0471

59

**IN THE COURT OF COMMON PLEAS**
**FRANKLIN COUNTY, OHIO**

The American Chemical Society,                    :

         Plaintiff,                    :        Case No. 02CVC-07-7653

    v.                    :        Judge Reece

Leadscope, Inc., et al..,                    :

         Defendants.                    :

**INTERROGATORY NO. 2**

If your answer to any question in section 3 (defamation) of the Verdict Form is "Yes", do you find that at the time of the defamation the Plaintiff knew the statements about the Defendant or Defendants defamed were false?

Yes ___X___          No _____

_signatures_

(Six of Eight Must Agree)

SUPP0472

60

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

THE AMERICAN CHEMICAL SOCIETY :
                                          :     Case No. 02 CVC-07-7653

    Plaintiff,                :

v.                            :

                                 :     Judge Guy L. Reece II
LEADSCOPE, INC. et al.,      :

    Defendants.            :

**INTERROGATORY NO. 4**

If your answer to any question in section 5 (unfair competition) of the Verdict Form is "Yes," please indicate on which of the following grounds you have found that plaintiff committed unfair competition.

Malicious Litigation                     Yes X    No _____

Circulation of False Statements and Rumors     Yes X    No _____
About Defendants

False Disparagement of Individual Defendants     Yes X    No _____

(Six of Eight Must Agree)

SUPP0473

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

THE AMERICAN CHEMICAL SOCIETY :
                                                :       Case No. 02 CVC-07-7653
          Plaintiff,                            :
                                                :
          v.                                    :
                                                :       Judge Guy L. Reece II
LEADSCOPE, INC. et al.,                         :
                                                :
          Defendants.                           :

## INTERROGATORY NO. 5

If you indicated in response to Interrogatory No. 4 that you found Plaintiff committed unfair competition by either (1) circulation of false statements or rumors about Defendants, or (2) false disparagement of individual Defendants, do you find that at the time the false statements or disparagement occurred the Plaintiff knew the statements made were false?

Yes X                                   No ____

(Six of Eight Must Agree)

SUPP0474

62

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

THE AMERICAN CHEMICAL SOCIETY :

    Plaintiff, :    Case No. 02 CVC-07-7653

    v. :

LEADSCOPE, INC. et al., :    Judge Guy L. Reece II

    Defendants. :

## INTERROGATORY NO. 6

Do you find that The American Chemical Society proved by a preponderance of the evidence that Leadscope, used Plaintiff trade secrets in U.S. Patent No. 6,323,852.

Yes _____        No ___X____

(Six of Eight Must Agree)

SUPP0475

63

*original*

**IN THE COURT OF COMMON PLEAS**
**FRANKLIN COUNTY, OHIO**

THE AMERICAN CHEMICAL SOCIETY,       :

                        Plaintiff,        :        Civil Action No. 02CVC-07-7653

            vs.                           :        Judge Guy L. Reece II

LEADSCOPE, INC., et al.,                  :

                        Defendants.       :

---

### VERDICT FORM

---

We the jury, being first duly sworn, do render this as our true verdict:

(PUT AN "X" ON THE APPROPRIATE LINE REFLECTING YOUR VERDICT.)

### PLAINTIFF'S CLAIMS

1.    On plaintiff's claim for breach of employment agreement against defendants Blower, Johnson and Myatt we find as follows:

a.    On plaintiff's claim against defendant Blower for breach of employment agreement, we find:

_____        For Plaintiff and find
                 Compensatory damages of $_____
                 - OR -
___X___          For Defendant Blower

**Signatures of Jurors joining in this verdict:**

SUPP0476

b.    On plaintiff's claim against defendant Johnson for breach of employment agreement we find:

_____    For Plaintiff and find

Compensatory damages of $_____

- OR -

___X___    For Defendant Johnson

**Signatures of Jurors joining in this verdict:**

Lana M. Coffman

Mrs. Regina L. Wright

Gwendolyn L. Miller

Kenneth W. Thompson

c.    On plaintiff's claim against defendant Myatt for breach of employment agreement we find:

_____    For Plaintiff and find

Compensatory damages of $_____

- OR -

___X___    For Defendant Myatt

**Signatures of Jurors joining in this verdict:**

Gwendolyn L. Miller

Lana M. Coff___

Mrs. Regina L. Wright

Kenneth W. Thompson

- 2 -

SUPP0477

65

2.      On plaintiff's claim against defendants Leadscope, Blower, Johnson and Myatt

for trade secret misappropriation we find as follows:

        a.      On plaintiffs claim against defendant Leadscope for trade secret

misappropriation we find:

|   |   |
|---|---|
| _____ | For Plaintiff and find |
|   | Compensatory damages of $_____ |
|   | Punitive damages of $_____ |
|   | - OR - |
| __X__ | For Defendant Leadscope |

**Signatures of Jurors joining in this verdict:**

_(handwritten juror signatures)_

Seth Draeger                     Gwendolyn L. Mullen

_____ Ray                    hana M. Coffman

Barbara A. Kolbe                 Mrs. Regina L. Wright

Kenneth W. Thompson

-3-

SUPP0478

66

b.     On plaintiff's claim against defendant Blower for trade secret

misappropriation we find:

     _____     For Plaintiff and find

                                        Compensatory damages of $_____

                                        Punitive damages of $_____

                                        - OR -

     ___X___     For Defendant Blower

**Signatures of Jurors joining in this verdict:**

_____     Mrs. Regina L. Wright

_____ Seth Anger     Lana M. Coffman

_____     Gwendolyn L. Mullen

_____ Kenneth W. Thompson _____

c.     On plaintiff's claim against defendant Johnson for trade secret

misappropriation we find:

     _____     For Plaintiff and find

                                          Compensatory damages of $_____

                                        Punitive damages of $_____

                                        - OR -

     ___X___     For Defendant Johnson

**Signatures of Jurors joining in this verdict:**

_____     Gwendolyn L. Mullen

_____ Seth Anger     Lana M. Coffman

_____ Barbara A. Kobee     Mrs. Regina L. Wright

_____ Kenneth W. Thompson _____

- 4 -

SUPP0479

d. On plaintiff's claim against defendant Myatt for trade secret

misappropriation we find:

<div style="margin-left: 50%;">

_____ For Plaintiff and find

Compensatory damages of $_____

Punitive damages of $_____

- OR -

_____X_____ For Defendant Myatt

</div>

**Signatures of Jurors joining in this verdict:**

_Seth Draper_

_Gwendolyn L. Miller_

_Lana M. Coffman_

_John A. Kobee_

_Mrs. Regina L. Wright_

_Kenneth W. Thompson_

IF YOU FOUND IN FAVOR OF THE PLAINTIFF ON THE TRADE SECRET MISAPPROPRIATION CLAIM IN 2, YOU SHOULD NOT ANSWER 2(e) BELOW. IF HOWEVER YOU FOUND IN FAVOR OF THE DEFENDANTS ON THE TRADE SECRET MISAPPROPRIATION CLAIM IN 2, PROCEED TO ANSWER 2 (e) BELOW.

e. In response to the question of whether or not the plaintiff's claim of trade

secret misappropriation was pursued in bad faith by the plaintiff we find as follows:

<div style="margin-left: 50%;">

_____X_____ YES - plaintiff pursued its claim in bad faith

- OR -

_____ NO - plaintiff did not pursue its claim in bad faith

</div>

**Signatures of Jurors joining in this verdict:**

_Seth Draper_

_Gwendolyn L. Miller_

_Lana M. Coffman_

_John A. Kobee_

_Mrs. Regina L. Wright_

_Kenneth W. Thompson_

- 5 -

SUPP0480

## DEFENDANTS' COUNTERCLAIMS

3. On defendants' counterclaims for defamation against plaintiff we find as follows:

a. On defendant Leadscope's counterclaim for defamation we find:

_____X_____  For Defendant Leadscope and find
Compensatory damages of $ 10,000,000
Punitive damages of $ 312,500
- OR -

_____  For Plaintiff

**Signatures of Jurors joining in this verdict:**

_Seth Drayer_                    _Gwendolyn L. Miller_
_Lana M. Coffman_
_Barbara A. Kolcee_              _Mrs. Regina L. Wright_
_Kenneth W. Thompson_

b. On defendant Blower's counterclaim for defamation we find:

_____X_____  For Defendant Blower and find
Compensatory damages of $ 1,000,000
Punitive damages of $ 312,500
- OR -

_____  For Plaintiff

**Signatures of Jurors joining in this verdict:**

_Seth Drayer_                    _Gwendolyn L. Miller_
_Lana M. Coffman_
_Barbara A. Kolcee_              _Mrs. Regina L. Wright_
_Kenneth W. Thompson_

- 6 -

SUPP0481

c.    On defendant Johnson's counterclaim for defamation we find:

_____X_____    For Defendant Johnson and find

Compensatory damages of $ _1,250,000_

Punitive damages of $ _312,500_

- OR -

_____    For Plaintiff

**Signatures of Jurors joining in this verdict:**

*[handwritten signatures]*

Seth Draper

Barbara A. Kobee

Kenneth W. Thompson

Gwendolyn L. Miller

Lana M. Coffman

Mrs. Regina L. Wright

d.    On defendant Myatt's counterclaim for defamation we find:

_____X_____    For Defendant Myatt and find

Compensatory damages of $ _1,500,000_

Punitive damages of $ _312,500_

- OR -

_____    For Plaintiff

**Signatures of Jurors joining in this verdict:**

*[handwritten signatures]*

Seth Draper

Barbara A. Kobee

Kenneth W. Thompson

Gwendolyn L. Miller

Lana M. Coffman

Mrs. Regina L. Wright

- 7 -

SUPP0482

4. On defendant Leadscope's counterclaim for tortious interference against plaintiff we find as follows:

      X

For Defendant Leadscope and find
Compensatory damages of $ 750,000
Punitive damages of $ 2,250,000

- OR -

      _____

For Plaintiff

**Signatures of Jurors joining in this verdict:**

_Seth Dwyer_

_Gwendolyn L. Miller_

_Lana M. Coffin_

_Mrs. Regina L. Wright_

_Kenneth W. Thompson_

5. On defendants' counterclaims for unfair competition against plaintiff, we find as follows:

a. On defendant Leadscope's counterclaim for unfair competition we find:

      X

For Defendant Leadscope and find
Compensatory damages of $ 750,000
Punitive damages of $ 1,000,000

- OR -

      _____

For Plaintiff

**Signatures of Jurors joining in this verdict:**

_Seth Dwyer_

_Gwendolyn L. Miller_

_Lana M. Coffin_

_Mrs. Regina L. Wright_

_Kenneth W. Thompson_

- 8 -

SUPP0483

b.    On defendant Blower's counterclaim for unfair competition we find:

_____X_____    For Defendant Blower and find
Compensatory damages of $ _1,000,000_
Punitive damages of $ _1,000,000_
- OR -

_____    For Plaintiff

**Signatures of Jurors joining in this verdict:**

_[signature]_
_[signature]_   Seth Draeger
_[signature]_
_Kenneth W. Thompson_

_Gwendolyn L. Miller_
_Lana M. Coffm_
_Mrs. Regina L. Wright_

_____

c.    On defendant Johnson's counterclaim for unfair competition we find:

_____X_____    For Defendant Johnson and find
Compensatory damages of $ _1,350,000_
Punitive damages of $ _1,000,000_
- OR -

_____    For Plaintiff

**Signatures of Jurors joining in this verdict:**

_[signature]_
_[signature]_   Seth Draeger
_[signature]_
_Kenneth W. Thompson_

_Gwendolyn L. Miller_
_Lana M. Coffman_
_Mrs. Regina L. Wright_

_____

- 9 -

SUPP0484

72

d. On defendant Myatt's counterclaim for unfair competition we find:

    X         For Defendant Myatt and find

Compensatory damages of $ 1,500,000

Punitive damages of $ 1,000,000

- OR -

_____ For Plaintiff

**Signatures of Jurors joining in this verdict:**

_Seth Draeger_    _Gwendolyn L. Miller_

_Lana M. Coffin_

_Mrs. Regina L. Wright_

6. On defendants' counterclaims for deceptive trade practices against plaintiff we find as follows:

a. On defendant Leadscope's counterclaim for deceptive trade practices we find:

_____ For Defendant Leadscope and find

Compensatory damages of $_____

- OR -

    X         For Plaintiff

**Signatures of Jurors joining in this verdict:**

_Seth Draeger_    _Gwendolyn L. Miller_

_Lana M. Coffin_

_Mrs. Regina L. Wright_

_Sandra Suncoy_

- 10 -

SUPP0485

b.    On defendant Blower's counterclaim for deceptive trade practices we find:

    _____    For Defendant Blower and find

                     Compensatory damages of $_____

                     - OR -

       X      For Plaintiff

**Signatures of Jurors joining in this verdict:**

*[handwritten signatures: Seth Draeger; Quendolyn L. Miller; Lana M. Coffin; Julian A. Kobee; Mrs. Regina L. Wright; Kenneth W. Thompson; Sandy Simon]*

c.    On defendant Johnson's counterclaim for deceptive trade practices we find:

    _____    For Defendant Johnson and find

                     Compensatory damages of $_____

                     - OR -

       X      For Plaintiff

**Signatures of Jurors joining in this verdict:**

*[handwritten signatures: Seth Draeger; Quendolyn L. Miller; Lana M. Coffin; Julian A. Kobee; Mrs. Regina L. Wright; Kenneth W. Thompson; Sandy Simon]*

- 11 -

SUPP0486

d.  On defendant Myatt's counterclaim for deceptive trade practices we find:

_____  For Defendant Myatt and find

Compensatory damages of $_____

- OR -

___X___  For Plaintiff

**Signatures of Jurors joining in this verdict:**

_Seth Draeger_

- 12 -

SUPP0487